IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tracy G. Elmore, | ) | C/A No.: 1:14-4144-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be reversed and remanded for further
proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On April 1, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on September 10, 2010.[1]  Tr. at 115, 117, 231–32, 233–40. Her applications were denied initially and upon reconsideration. Tr. at 144–48, 152–53, 154–55. On May 14, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tracy Daly. Tr. at 49–94 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 21, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 24–48. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 23, 2014. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 51. She completed the eighth grade. Tr. at 58. Her past relevant work ("PRW") was as a brake assembler and a lingo/loom cleaner. Tr. at 85–86. She alleges she has been unable to work since September 22, 2011. Tr. at 54.

---

[1] During the hearing, Plaintiff amended her alleged onset date to September 22, 2011. Tr. at 54.

2.    Medical History

On December 31, 2010, Plaintiff presented to the emergency room ("ER") at Abbeville Area Medical Center for a constant cough. Tr. at 467. She was diagnosed with cough, hypertension, and reflux and discharged to her home. Tr. at 468.

Plaintiff presented to Robert Kellett, M.D. ("Dr. Kellett"), to establish treatment on January 27, 2011. Tr. at 312. Dr. Kellett prescribed Plaintiff medications for hypertension and gastroesophageal reflux disease ("GERD"). Tr. at 313. On February 1, 2011, he noted Plaintiff was unable to obtain a computed tomography ("CT") scan because she could not pay a $400 upfront fee. Tr. at 31. He encouraged Plaintiff to apply for indigent care. *Id.*

Plaintiff followed up with Dr. Kellett for a blood pressure recheck on February 17, 2011. Tr. at 315. Dr. Kellett indicated Plaintiff was doing well without complaint. *Id.* Because Plaintiff's blood pressure continued to be elevated, Dr. Kellett prescribed a second medication for hypertension. *Id.*

On March 17, 2011, Plaintiff reported to Dr. Kellett that she was feeling tired all the time and experiencing shortness of breath on exertion. Tr. at 316. Dr. Kellett observed Plaintiff to have nasal congestion and diagnosed allergic rhinitis. Tr. at 317.

Plaintiff presented to Paul E. Kim, M.D. ("Dr. Kim"), for a cardiac consultation on April 26, 2011. Tr. at 321. Dr. Kim observed a systolic murmur and trace non-pitting edema in Plaintiff's ankles. Tr. at 322. Plaintiff's EKG was normal. *Id.* Dr. Kim indicated he suspected a bicuspid aortic valve and would obtain an echocardiogram. *Id.* The echocardiogram indicated Plaintiff had an impaired relaxation pattern of left ventricular

3

diastolic filling; a mildly dilated left atrium; an estimated left ventricular ejection fraction of 55 to 60 percent; mild tricuspid and mitral regurgitation; mild left ventricular hypertrophy; and moderately elevated pulmonary artery systolic pressure. Tr. at 324.

On May 1, 2011, Plaintiff presented to the ER at Abbeville Area Medical Center with a headache. Tr. at 457. Russell Ross, M.D. ("Dr. Ross"), prescribed Toradol. Tr. at 458.

Plaintiff presented to orthopedist John H. Cathcart, III, M.D. ("Dr. Cathcart"), for right upper extremity pain on May 6, 2011. Tr. at 319–20. She complained of pain and numbness from her right shoulder to her fingers. Tr. at 319. Plaintiff had adequate range of motion ("ROM") in her neck, but complained of pain with all motion in her shoulder. *Id.* She had a normal motor exam and rotator cuff strength, but Spurling's test revealed marked discomfort and she complained of numbness during the sensory exam. *Id.* Magnetic resonance imaging ("MRI") of Plaintiff's right shoulder revealed some tendinosis in her rotator cuff, but the rotator cuff was basically intact. *Id.* Plaintiff had some degenerative disc disease in her cervical spine and some bulging at C6-7, but no obvious impingement along her nerve roots. *Id.* Dr. Cathcart indicated he could give Plaintiff a shot in her shoulder, but stated he did not think the shot would relieve her upper extremity pain. Tr. at 320. He stated that Plaintiff's family physician may consider nerve conduction studies and electromyography ("EMG"). *Id.*

Plaintiff presented to Dr. Kellett for a three-month follow up on June 20, 2011. Tr. at 329. She indicated that the injection she received for her right shoulder pain had only helped a little and stated her shoulder pain continued to be a 10 of 10. Tr. at 329. Dr.

4

Kellett observed normal ROM, no impingement, and no tenderness in Plaintiff's right acromioclavicular ("AC") joint or right subscapularis muscle. *Id.* However, he noted tenderness in Plaintiff's right supraspinatus muscle. *Id.* Dr. Kellett prescribed Ibuprofen 800 milligrams, Medrol (Pak) 4 milligrams, and Lortab 5-500 milligrams for tendonitis. Tr. at 330.

On August 11, 2011, Plaintiff complained to Dr. Kellett of joint swelling, wrist pain, and bilateral ankle pain. Tr. at 339. Plaintiff's blood pressure was elevated at 154/95. *Id.* Her blood glucose and A1C were elevated. *Id.* Dr. Kellett also noted Plaintiff to have a body mass index ("BMI") of 40.14. *Id.* A note from the next day indicated Plaintiff to have right shoulder pain, sharp pain on the underside of her right foot, and chest pain and shortness of breath with walking and exercise. Tr. at 340. Dr. Kellett prescribed another Medrol (Pak) and Ultram 50 milligrams. Tr. at 341.

Plaintiff presented to Self Regional Healthcare on August 17, 2011, for a stress echocardiogram. Tr. at 352. The test showed poor exercise tolerance, but Plaintiff had no evidence of stress-induced ischemia. Tr. at 386. A transthoracic echocardiography indicated mild concentric left ventricular hypertrophy and an overall left ventricular ejection fraction of 60 to 65 percent. Tr. at 388.

Plaintiff participated in a regular exercise stress test on September 6, 2011, that showed her to have good exercise tolerance, but hypertensive response to exercise. Tr. at 485–86.

On September 12, 2011, state agency medical consultant Matthew Fox, M.D. ("Dr. Fox"), reviewed the case and completed a physical residual functional capacity

("RFC") assessment. Tr. at 98–103. Dr. Fox indicated Plaintiff's severe impairments included chronic heart failure and disorders of muscles, ligament, and fascia. Tr. at 99. He found Plaintiff to be limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push and/or pull with the upper extremity; occasionally climbing ramps/stairs/ladders/ropes/scaffolds; occasionally crawling; occasional reaching with the right upper extremity; frequently handling, fingering, and feeling with the right upper extremity; and should avoid concentrated exposure to hazards. Tr. at 100–103.

On December 1, 2011, Plaintiff presented to Lisa D. Jennings, M.D. ("Dr. Jennings"), for pain and numbness in her arm. Tr. at 433. Dr. Jennings observed Plaintiff to have tenderness in her right AC joint and deltoid and to have painful forward flexion, abduction, and internal rotation. Tr. at 434. She assessed benign essential hypertension and joint pain, localized in the shoulder. *Id.* Dr. Jennings noted that Plaintiff's pain appeared to be arthritic in nature, but that she refused an injection. *Id.* She prescribed a steroid taper and advised Plaintiff to use heat, massage, and ROM exercises. *Id.*

Plaintiff presented to Ashley Wiggins, M.D. ("Dr. Wiggins"), on December 21, 2011, for right wrist pain and edema. Tr. at 435. She indicated she had treated the pain with Advil and by soaking her wrist in Epsom salt. *Id.* Dr. Wiggins observed Plaintiff to have normal ROM and strength, but to have swelling and tenderness to palpation over her volar wrist near the base of her thumb and pain with flexion and radial deviation. Tr. at 436. She indicated Plaintiff likely had arthritis, but stated she was unable to obtain x-rays

6

in her office and would treat Plaintiff's symptoms with non-steroidal anti-inflammatory drugs ("NSAIDs"). *Id.*

Plaintiff followed up with Dr. Wiggins on January 6, 2012. Tr. at 437. She stated her right wrist pain was much less painful, but indicated she continued to have a knot and experience swelling. *Id.* Dr. Wiggins observed Plaintiff to have swelling and a small, bony mass on her medial wrist near the base of her thumb. Tr. at 438. Dr. Wiggins indicated x-rays showed no fractures and that Plaintiff likely had arthritis. Tr. at 439. She prescribed Meloxicam. *Id.*

State agency medical consultant Frank Ferrell, M.D. ("Dr. Ferrell"), reviewed Plaintiff's medical records and completed a physical RFC assessment on February 7, 2012. Tr. at 122–25. Dr. Ferrell also found chronic heart failure and disorders of muscle, ligament, and fascia to be severe impairments. Tr. at 122. He found essential hypertension and sleep-related breathing disorders to be non-severe impairments. *Id.* Dr. Ferrell assessed Plaintiff to have the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push/pull with the right upper extremity; occasionally climb ramps/stairs/ladders/ropes/scaffolds; occasionally crawl; occasionally reach overhead with the right upper extremity; frequently handle, finger, and feel with the right upper extremity; and avoid concentrated exposure to hazards. Tr. at 123–25.

On February 27, 2012, Plaintiff presented to Dr. Jennings with right wrist pain and swelling and dry areas around her eyebrows and ears. Tr. at 539. Dr. Jennings indicated Plaintiff was experiencing symptoms of atopic dermatitis. *Id.*

Plaintiff presented to Abbeville Area Medical Center on April 15, 2012, complaining of right shoulder pain and swelling in her right wrist. Tr. at 445. Jason Dahlberg, M.D. ("Dr. Dahlberg") indicated Plaintiff had trace swelling over her wrist with no tenderness to palpation. *Id.* An x-ray showed a small subchondral cyst in the head of Plaintiff's humerus. Tr. at 455. Dr. Dahlberg diagnosed shoulder pain, hypertension, and COPD and prescribed Prednisone. Tr. at 446.

Plaintiff next visited Dr. Wiggins on April 25, 2012, for pain and swelling in her shoulder and arm. Tr. at 536. Plaintiff had no tenderness, full ROM, and normal strength, but experienced pain with external rotation and abduction of her right shoulder. Tr. at 537. Dr. Wiggins prescribed Ibuprofen and Ultram and referred Plaintiff for an MRI. Tr. at 538.

An MRI of Plaintiff's right shoulder on May 7, 2012, indicated a partial thickness articular surface tear at the distal supraspinatus, infraspinatus tendinosis, and a possible predisposition to impingement. Tr. at 481.

Plaintiff visited Dr. Jennings to discuss her MRI results on May 15, 2012. Tr. at 534. Dr. Jennings injected Plaintiff's right shoulder joint with Licocaine, Bupivacaine, and Methylprednisolone. Tr. at 535.

Plaintiff presented to the ER at Abbeville Area Medical Center on December 20, 2012, with a frontal headache and nausea. Tr. at 505. Dr. Kellett diagnosed a migraine headache and prescribed Toradol and Phenergan. Tr. at 506.

Plaintiff presented to the ER at Abbeville Area Medical Center on January 2, 2013, with left knee, leg, and ankle pain as the result of a fall the day before. Tr. at 493. Christopher Oxendine, M.D. ("Dr. Oxendine"), observed Plaintiff to have tenderness to palpation over the medial joint line of her left knee and ankle, a small effusion, swelling, and decreased ROM in her left ankle joint. *Id.* Dr. Oxendine diagnosed Plaintiff with left ankle and knee sprains and prescribed a stirrup ankle brace. Tr. at 494.

Plaintiff followed up with Dr. Wiggins for right shoulder pain and left hand numbness on January 29, 2013. Tr. at 531. She endorsed continued swelling pain in her left foot and leg. *Id.* Dr. Wiggins observed Plaintiff to have lateral swelling of her left ankle, tenderness in her lateral malleolus, and painful eversion. Tr. at 533. She referred Plaintiff for another x-ray that failed to reveal a fracture. *Id.* She prescribed Tramadol and Ibuprofen, instructed Plaintiff to continue to use her walking brace, and referred her for a functional capacity exam. *Id.*

Plaintiff underwent a physical capacities evaluation with Timothy Couture, MSPT ("Mr. Couture"), on April 18, 2013. Tr. at 542–48. Mr. Couture determined Plaintiff demonstrated full and consistent effort and could meet the physical demands of light to medium work, with a maximum occasional lift of 28 pounds. Tr. at 542. Plaintiff was limited to standing and walking for less than 10 minutes per hour. *Id.* She maintained a sitting position for 30 minutes at a time and was observed to fall asleep while sitting in

Mr. Couture's waiting room for 10 minutes. Tr. at 545. She could occasionally climb, balance, squat, kneel, and bend, but could never crouch. Tr. at 546. She could occasionally reach, handle, feel, and push/pull. *Id.* Plaintiff attempted all activities, but had poor mechanics and decreased safety. Tr. at 547. Mr. Couture indicated Plaintiff should limit her exposure to overhead activities. *Id.* Dr. Couture concluded that Plaintiff would be unlikely to sustain an eight-hour workday or 40-hour workweek and could likely not tolerate more than two hours of work in a standard workday. *Id.* On May 7, 2013, Dr, Wiggins signed Mr. Couture's report to indicate her agreement with its findings. Tr. at 548; *see also* Tr. at 554.

On June 19, 2013, Plaintiff underwent an adult psychological evaluation with Joseph K. Hammond, Ph. D. ("Dr. Hammond"). Tr. at 548–52. She reported going to the ninth grade in a self-contained classroom setting. Tr. at 549. She indicated she had difficulty reading and a learning disability, but denied repeating any grades. *Id.* Plaintiff stated she showered, dressed, prepared food, washed dishes, cleaned laundry, had a driver's license, drove, shopped independently, attended church, and spent time with family. Tr. at 550. Dr. Hammond administered the Wide Range Achievement Test–Fourth Edition ("WRAT–4") and Plaintiff obtained a score of 55 on word recognition, 55 on sentence comprehension, and 55 on arithmetic. Tr. at 551. On the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS–IV"), Plaintiff obtained a verbal comprehension score of 63, a perceptual reasoning score of 73, a working memory score of 71, a processing speed score of 79, and a full scale score of 66. Tr. at 551. Dr. Hammond's diagnostic impression was cognitive disorder, not otherwise specified

("NOS"). *Id.* Dr. Hammond indicated Plaintiff "currently scored in the mildly mentally retarded range of general intellectual ability, but she described a history of at least borderline adaptive functioning." *Id.* He further indicated the following regarding Plaintiff's abilities:

> She was able during this evaluation to complete some tasks in a timely manner and her relative personal strength was in terms of Processing Speed.

> She related in a pleasant, cooperative, polite, and appropriate manner and appeared to have social skills adequate for an appropriate response to a co-worker or supervisor.

> She participates in a fair range of activities of daily living, indicating for example that she is able to cook, handle money to some extent for shopping, and does possess a driver's license.

> She appeared to have moderate to severe limitations in terms of her capacity for persistence because of cognitive limitations.

> She appeared capable of managing funds.

Tr. at 551–52.

On December 23, 2013, Robin L. Moody, Ph. D., LPC/S ("Dr. Moody"), evaluated Plaintiff through a clinical interview and administered the Mini-Mental State Examination–Second Edition ("MMSE–2") and the Adaptive Behavior Assessment System–Second Edition ("ABAS–II"). Tr. at 555–60. Plaintiff indicated she was unable to read or write well and stated that she obtained past employment because others completed the applications for her. Tr. at 555. She reported an arrest and payment of a fine for writing bad checks more than 20 years earlier. Tr. at 556. She indicated she had not attempted to manage her own bank account since that time. *Id.* She reported she

dropped out of school in the ninth grade, after being enrolled in special education classes. *Id.* She indicated she did not repeat any grades. *Id.* She stated she worked in her last job for 12 years and had never been fired from a job. Tr. at 557. She denied having been employed in any jobs that required operating a cash register or counting money. *Id.* She indicated she had received assistance in completing job applications in the past. *Id.* She stated she typically sat around her house and watched television. *Id.* She indicated she had a driver's license, but stated she took the oral test to obtain her license. *Id.* She indicated she completed household chores and prepared meals, but was unable to read recipes. *Id.* She stated she did not maintain a bank account and required assistance from her daughters when shopping for groceries because she could not calculate the cost of items or remember what to buy. *Id.* She reported supervising her grandchildren, but denied bathing the children or changing their diapers. *Id.* Plaintiff demonstrated slowed thought processes and had some difficulty pronouncing words. Tr. at 557–58. She had fair to poor memory and concentration and her sustained attention was distractible. Tr. at 558. She obtained a score of 28/30 on the MMSE and could identify three of three items on immediate recall and two of three items on delayed recall. *Id.* Plaintiff obtained extremely low scores in the communication, community use, functional academics, home living, and social areas and borderline scores in health and safety, leisure, self-care, and self-direction. *Id.* Dr. Moody referred to the WAIS–IV scores assessed by Dr. Hammond and indicated Plaintiff's school records were consistent with Dr. Hammond's finding that her cognitive functioning was in the extremely low range. Tr. at 559. She stated the WRAT–4 scores assessed by Dr. Hammond were also consistent with illiteracy. *Id.* Dr.

Moody concluded based on the ABAS–II and the results obtained by Dr. Hammond that Plaintiff met the criteria for a diagnosis of mild mental retardation. *Id.* She indicated Plaintiff could perform multiple activities of daily living, but was unable to live on her own or manage her own funds. *Id.* She indicated Plaintiff could not follow simple instructions and had poor concentration, persistence, and pace. *Id.*

      C.      The Administrative Proceedings

            1.      The Administrative Hearing

                  a.      Plaintiff's Testimony

At the hearing on May 14, 2013, Plaintiff testified she was 5'8" tall and weighed 255 pounds. Tr. at 58. She stated she was enrolled in special education classes from the first through eighth grades. Tr. at 59. She indicated she left school after the eighth grade and never obtained a general equivalency diploma ("GED").[2] *Id.* She denied being able to read and stated she could only read a few words if she were handed a newspaper. *Id.* She subsequently indicated she was unable to read the medications on the medications list in the record. Tr. at 82.

Plaintiff testified she stopped working because she was often sick, tired, and weak and her blood pressure was frequently elevated. Tr. at 60. However, she later indicated her employer closed the facility. Tr. at 64. She stated her last job at Honeywell required her to place brakes on an assembly line. Tr. at 61. She indicated she previously worked at Westpoint, where she cleaned out looms using an air hose. Tr. at 63.

---

[2] Plaintiff reported in a disability report that she obtained a GED in 1978. Tr. at 263.

Plaintiff testified she was most limited in her ability to work because of her sleep apnea. Tr. at 64. She stated she used a CPAP machine, but was only able to sleep for two hours at a time. Tr. at 65. She indicated she felt tired and slept during the day. *Id.* She testified her blood pressure was elevated while she was working at Honeywell. Tr. at 66. She stated she often developed headaches and was sent home from work when her blood pressure was too high. *Id.* Plaintiff testified she became dizzy and tired when her blood pressure was elevated. Tr. at 67. She endorsed daily pain in her right shoulder that she rated as a five to eight of 10. Tr. at 68. She stated she also experienced numbness in her right hand that prevented her from using it. Tr. at 68–69. She indicated she was unable to reach overhead or to pick up items. Tr. at 69. She stated she had sharp pain and swelling in her right wrist. *Id.* She endorsed pain in her right knee that affected her ability to walk. Tr. at 70. She indicated she injured her left knee after sustaining a fall in January. Tr. at 70–71. She noted she was wearing a left ankle brace and continued to experience swelling and pain that was a five to seven or eight on a 10-point scale. Tr. at 71. She indicated her pain was exacerbated by walking. *Id.* Plaintiff testified she experienced burning in her chest from GERD. Tr. at 72. She indicated obesity, sleep apnea, and hypertension caused her to become tired and weak. *Id.* Plaintiff denied experiencing any side effects from her medications. Tr. at 83.

Plaintiff testified she could sit for 10 minutes at a time, but would typically fall asleep if she sat still for more than 10 minutes. Tr. at 72–73. She indicated she could stand for 20 minutes at a time and walk comfortably for 10 minutes at a time. *Id.* She stated she could lift about 15 pounds. *Id.*

Plaintiff testified she spent about half of her day sleeping. Tr. at 73. She indicated she walked and talked to others in an attempt to stay awake during the periods when she was not sleeping. Tr. at 74. She stated she typically fell asleep after watching television for 10 minutes. *Id.* Plaintiff indicated she sometimes cooked, but that her daughter did most of the cooking for her household. *Id.* She testified she washed dishes for 10 minutes at a time and swept, but denied vacuuming, mopping, doing laundry, and performing yard work. Tr. at 74–75. She indicated she visited the grocery store once a month with her daughter and attended church three times per month. Tr. at 76–77. She stated she last went fishing during the prior year and played cards with family members at the beginning of the year. Tr. at 79, 80. She testified she drove short distances approximately five or six times per month and drove for a maximum of 15 minutes at a time. Tr. at 76, 78. She indicated she babysat for her four grandchildren, who ranged in age from one to 14. Tr. at 78. She stated she did not visit friends often, but had visited some friends in Abbeville during the prior month. Tr. at 80. She stated she visited her daughters four times per month. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") John Black reviewed the record and testified at the hearing. Tr. at 84–89. The VE categorized Plaintiff's PRW as a brake assembler, *Dictionary of Occupational Titles* ("*DOT*") number 806.684-010, as medium in exertional level in the *DOT* and light as described by Plaintiff and unskilled with a

15

specific vocational preparation ("SVP") of 2 and a lingo/loom cleaner,[3] *DOT* number 683.687-026, as light in exertional level and unskilled with an SVP of 2. Tr. at 85–86. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following additional limitations: frequently balance; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; occasionally reach overhead with the right upper extremity; frequently reach in all other directions with the right upper extremity; frequently hande, finger, and performing fine manipulation with the right upper extremity; must avoid concentrated exposure to hazardous machinery; and limited to simple, routine work that does not require an ability to read and write to learn or complete the job tasks. Tr. at 86–87. The VE testified that the hypothetical individual could perform the job of lingo/loom cleaner. Tr. at 87.

The ALJ next asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, but required the ability to alternate between sitting and standing positions as needed throughout the day without being off-task. Tr. at 88. He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the individual would not. *Id.* The ALJ asked if the individual could perform any jobs. *Id.* The VE identified light jobs with an SVP of two as a seconds handler, *DOT* number 782.687-050, with 16,000 positions in South Carolina

---

[3] The transcript reflects a job of "glue cleaner" and "room cleaner" consistent with this *DOT* number. Tr. at 85, 87. It is the undersigned's interpretation based on the *DOT* description that this job is otherwise known as a "loom cleaner," and that "glue" and "room" reflect errors in the transcription of the hearing testimony.

and 1,500 positions nationally; a document preparer, *DOT* number 249.587-018, with 1,200 positions in South Carolina and 44,000 positons nationally; and marker/stamper, *DOT* number 920.687-126, with 900 positions in South Carolina and 34,000 positions nationally. *Id.*

For a third hypothetical, the ALJ asked the VE to assume the individual could not sit and stand for eight hours a day, five days a week, or over a 40-hour workweek. Tr. at 89. The VE testified such an individual would not be employable in the national economy. *Id.*

### 2. The ALJ's Findings

In his decision dated August 21, 2013, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
2. The claimant has not engaged in substantial gainful activity since September 22, 2011, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et. seq.*)
3. The claimant has the following severe impairment: mild mental retardation (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant also had the following non-severe impairments: degenerative disc disease (DDD), shoulder impingement syndrome, obesity, hypertension, obstructive sleep apnea and left ankle pain (20 CFR 404.1521 and 416.921).
5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).
6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In particular, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently. She can stand or walk for approximately 6 hours of an 8-hour workday and sit for approximately 6 hours of an 8-hour workday with normal breaks.

However, the claimant must avoid concentrated exposure to hazardous machinery and unprotected heights. She is limited to simple, routine and rote tasks, with no requirement for reading and writing to learn or perform tasks.

7. The claimant is capable of performing past relevant work as a loom cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8. The claimant was born on September 22, 1961 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (20 SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from September 22, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 29–43.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to find that Plaintiff's combination of hypertension, sleep apnea, and obesity were severe impairments;

2) the ALJ failed to find that Plaintiff's impairment met Listing 12.05C;

3) the ALJ should have found Plaintiff disabled based on Grid Rule 202.09 because of her illiteracy; and

4) the ALJ improperly assessed Plaintiff's RFC because he failed to evaluate the opinion of Plaintiff's treating physician.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from

---

404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the

Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Severe Impairments

Plaintiff argues the ALJ erred in failing to consider her hypertension, sleep apnea, obesity, shoulder impairment, and degenerative disc disease as severe impairments. ECF Nos. 14 at 22 and 17 at 1. She maintains that these impairments act in combination to cause severe fatigue and drowsiness. [ECF No. 14 at 22]. She contends the record showed a tear and tendinosis in her shoulder. [ECF No. 17 at 2]. She also contends the ALJ ignored the opinions of the state agency physicians that assessed her physical impairments to be severe. *Id.*

The Commissioner argues the decision, when read as a whole, indicates the ALJ properly considered Plaintiff's combination of impairments. [ECF No. 16 at 15].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if

22

it does not significantly limit your physical or mental ability to do basic work activities). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he

23

evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the claimant's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* The court later indicated that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

The ALJ found Plaintiff's only severe impairment to be mild mental retardation. Tr. at 29. He specifically found that degenerative disc disease, shoulder impingement syndrome, obesity, hypertension, obstructive sleep apnea, and left ankle pain were non-severe impairments. Tr. at 30. He found Plaintiff's hypertension to be controlled with medications. *Id.* He indicated Plaintiff's degenerative disc disease was non-severe because she had no nerve root impingement, no surgical intervention, normal gait, normal sensation, full strength, and a supple neck. *Id.* He determined the objective tests indicated no significant abnormalities in Plaintiff's right shoulder or wrist and Plaintiff had no more than minimal functional limitations. *Id.* The ALJ found that Plaintiff's sleep apnea was treated through use of a CPAP machine and that the records did not reflect the level of fatigue Plaintiff complained of during the hearing. Tr. at 31. He concluded the

24

objective evidence did not reveal significant objective findings to support Plaintiff's complaints regarding left ankle pain and did not reflect that the impairment would last for 12 months or more. *Id.* He found that Plaintiff's obesity did not "limit her stamina or her exertional capabilities in lifting, standing, or walking." Tr. at 32.

Although the ALJ articulated that mild mental retardation was Plaintiff's only severe impairment, he assessed both mental and physical restrictions, but explained his decision to assess physical restrictions as follows:

> Finally, while no physical impairment, either singly or in combination, directly limits the claimant's exertional capabilities, the undersigned notes the claimant's mental impairments may prevent her from fully appreciating the dangers or hazards innate in medium and heavy work. As a result, the impact of the claimant's mental impairment was further accommodated in the assigned residual functional capacity by limiting the exertional level to light work; thus the assigned exertional restriction addresses limitations arising from the claimant's mental limitations rather than any physical functional limits.

Tr. at 40.

The undersigned recommends the court find the ALJ erred in assessing Plaintiff's severe impairments and their combined effects. The record suggests mild mental retardation was not the only impairment that imposed limitations on Plaintiff's ability to perform basic work activities. *See* SSR 96-3p; 20 C.F.R. §§ 404.1521(a), 416.921(a).

The ALJ did not adequately consider the limitations imposed by Plaintiff's combination of sleep apnea, hypertension, and obesity. Mr. Couture observed Plaintiff to fall asleep while sitting in his waiting room for 10 minutes. Tr. at 545. Plaintiff testified that her combination of obesity, hypertension, and sleep apnea caused her to become tired and weak and that she often slept during the day after sitting for longer than 10 minutes.

Tr. at 65, 72–73. The vocational implication of Plaintiff's need to sleep during the day was an inability to complete an eight-hour workday, and the VE testified that an individual who was unable to complete an eight-hour workday would be unemployable. Tr. at 89. In addition to Plaintiff's testimony and indications in the record that Plaintiff was tired and fatigued, the hearing transcript reflects that Plaintiff fell asleep during the hearing. Tr. at 89. The following exchange took place:

> ATTY:    I'd just like to state for the record that the claimant fell asleep while you were questioning the VE.
>
> ALJ:    Okay, that's one of the downsides to video teleconferencing. I didn't see that.
>
> ATTY:    Well, and she's still asleep.
>
> ALJ:    All right. Ms. Elmore, can you hear me? Wake her up.
>
> ATTY:    Ms. Elmore?
>
> CLMT:    Excuse me, sir.

*Id.* Despite this evidence to the contrary, the ALJ concluded that Plaintiff's sleep apnea did not reflect the level of fatigue she complained of and that her obesity did not limit her stamina. Tr. at 31–32. In the absence of any explanation as to how the ALJ reconciled his conclusion with the evidence discussed above, the undersigned is unable to find the ALJ's determination that obesity, sleep apnea, and hypertension were non-severe impairments to be supported by substantial evidence. In addition, the record does not reflect the ALJ considered these impairments in combination even though Plaintiff indicated the three impairments combined to limit her ability to complete a work day.

The ALJ also failed to reconcile his determination that degenerative disc disease and shoulder impingement syndrome were non-severe impairments with the opinions of the two state agency medical consultants. Both Dr. Fox and Dr. Ferrell concluded that Plaintiff's physical impairments were severe and imposed significant work-related limitations. *See* Tr. at 98–103, 122–25. The ALJ rejected the state agency consultants' opinions because he did not believe the objective and diagnostic evidence or Plaintiff's treatment history and daily activities supported their conclusions that Plaintiff's impairments were severe. Tr. at 38–39. However, in rejecting the state agency medical consultants' opinions, he cited only the evidence that supported his opinion that Plaintiff's physical impairments were non-severe. *See id.* The ALJ ignored Plaintiff's frequent complaints of right upper extremity pain and numbness, as well as her medical providers' observations of tenderness in her right upper extremity. *See* Tr. at 319–20, 329, 339, 433–34, 435, 437–39, 445–46, 531, 539. He also ignored the fact that the MRI performed on May 7, 2012, provided objective findings to support Plaintiff's complaints. Tr. at 481 (partial thickness articular surface tear at distal supraspinatus). The ALJ failed to reconcile his conclusion that Plaintiff had no limitations that resulted from her physical impairments with the specific evidence cited above or with the state agency consultants' opinions that were more consistent with the evidence showing Plaintiff to have physical impairments and limitations.

Although this court has held that a failure to identify an impairment as "severe" at step two may be remedied by considering the impairment at subsequent steps in the evaluation process, the record does not reflect that the ALJ adequately considered

Plaintiff's physical impairments at subsequent steps. The undersigned finds compelling the fact that the ALJ explicitly stated that he was not considering any of Plaintiff's other impairments in assessing physical limitations as part of the RFC. *See* Tr. at 40. This court is unable to find the ALJ considered Plaintiff's sleep apnea, hypertension, obesity, degenerative disc disease, shoulder impingement syndrome, or any other impairment in the face of the ALJ's explicit denial of such consideration. Second, while some of the physical restrictions assessed by the ALJ may be consistent with limitations imposed by the impairments he found to be non-severe, the RFC fails to account for all of Plaintiff's documented limitations. The ALJ did not include any restrictions in the RFC that were consistent with evidence that Plaintiff required rest periods throughout the day. He also deviated from the restrictions identified by Drs. Fox and Ferrell in that he did not limit Plaintiff to frequent pushing/pulling, handling, fingering, and feeling with her right upper extremity; occasional climbing; occasional crawling; or occasional reaching with her right upper extremity. *See* Tr. at 100–03, 122–25. As discussed above, the evidence arguably supports such restrictions as a result of Plaintiff's right shoulder tendinosis, surface tear, and possible impingement. *See* Tr. at 481–82. Therefore, the ALJ's error in assessing Plaintiff's severe impairments at step two was not cured by adequate consideration of the impairments at subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

2.     Listing 12.05C

Plaintiff submitted to the Appeals Council records from McCormick County School District. Tr. at 297–300. Plaintiff's school records reflect that she was retained in the first grade, achieved poor grades throughout school, and failed the tenth grade twice before dropping out of school. Tr. at 298. In an evaluation of personal and social assets for all grades, Plaintiff generally received an "N"[6] in each of the following areas: cooperation, courtesy, dependability, industriousness, initiative, leadership, emotional maturity, personal appearance, self-control, honesty, perseverance, and service to school. Tr. at 299. Standardized test scores indicate Plaintiff achieved below grade-level scores during all periods of testing. Tr. at 300.

Plaintiff argues the ALJ erroneously concluded that her impairment did not meet Listing 12.05C. [ECF No. 14 at 16–17]. She maintains she had a valid full-scale IQ score of 66 and a valid verbal IQ score of 63, which satisfied the first requirement under Listing 12.05C. *Id.* at 17. She contends that the ALJ erroneously discounted her IQ scores because the record contained no evidence of her IQ prior to the age of 22. *Id.* However, she argues that, even if this was relevant to the determination, it was remedied by the submission of school records to the Appeals Council that showed significantly below-average test scores. *Id.* Plaintiff maintains the ALJ erred in concluding she had no other mental or physical impairment that imposed an additional and significant work-related

---

[6] "N" is generally used on report cards to indicate areas in which a student needs improvement. *What the Report Card Really Means*, SCHOLASTIC. COM, www.scholastic.com/parents/resources/article/grades-report-cards/what-report-card-really-means (last visited Aug. 19, 2015).

limitation. *Id.* at 18. She further contends the ALJ erred in determining she did not have deficits in adaptive functioning. *Id.*

The Commissioner argues Plaintiff's impairment does not meet Listing 12.05C. [ECF No. 16 at 16]. She maintains the ALJ's conclusion that Plaintiff did not have deficits in adaptive functioning was supported by substantial evidence, including the fact that she held a driver's license; worked for a significant period; and engaged in daily activities that included personal care, shopping for groceries, fishing, playing cards, visiting family members, cooking, washing dishes, sweeping, doing laundry, attending church, and babysitting her grandchildren. *Id.* at 18–20. She contends Dr. Moody's report was influenced significantly by Plaintiff's self-reported limitations, which conflicted with other evidence in the record. *Id.* at 20–21.

In her reply brief, Plaintiff argues the Commissioner cannot rely on arguments the ALJ failed to advance to support his decision. [ECF No. 17 at 6].

The introductory paragraph to Listing 12.05 provides the following: "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05. To meet the required level of severity for a finding of disability under Listing 12.05, the claimant must meet the definition of intellectual disability set forth in the introductory paragraph to the listing plus the requirements in either part A, B, C, or D. *Id.*; *see also Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012).

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002). In *Atkins*, the Supreme Court indicated intellectual disability was characterized by "significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3.

To satisfy Listing 12.05C, the claimant must have both "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05C. "Once it is established that the claimant's IQ falls within the range required by § 12.05C, the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984).

The ALJ concluded Plaintiff did not meet the requirements of Listing 12.05C because she did not "have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. at 33. He indicated, "[o]f note, although the claimant testified that she was in special education classes and had only an eighth grade education, there are no substantiating records indicating the claimant's IQ prior to the age of twenty-two, as required by Listing 12.05. *Id.* He also concluded "the claimant's adaptive

functioning was not significantly decreased, as evidenced by her ability to get a driver's license and her ability to do past work at substantial gainful activity levels (Exhibit 6D)." *Id.*

The ALJ erroneously stated that Listing 12.05 requires substantiating records documenting a claimant's IQ before age 22. In *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985), the Fourth Circuit rejected such an argument and indicated "[t]he Secretary's regulations expressly define mental retardation as denoting 'a lifelong condition.'" The court explained "there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life," but "[t]he fact that one was not earlier taken does not preclude a finding of earlier retardation." *Branham*, 775 F.2d at 1274. Therefore, the undersigned concludes the ALJ erred to the extent that he did not credit Plaintiff's verbal IQ of 63 and full scale IQ of 66 in considering Listing 12.05C merely because the record contained no IQ assessment prior to age 22.

The instant case draws parallels to *Jackson*, 467 F. App'x at 218. In *Jackson*, the plaintiff's representative submitted school records to the Appeals Council, after having been unable to obtain the records before the ALJ issued a decision. *Id.* The plaintiff's school records showed she "was identified as a special needs student as early as the seventh grade," was severely deficient in her intellectual abilities, and had a verbal IQ of 67. *Id.* The court found "[n]ot only did these forms provide documentation that the ALJ's decision was lacking and eliminate the ALJ's very reason for denying Jackson's claim, they also reinforced the credibility of Jackson's testimony" and contained information

that was "directly material to the final prong of Listing 12.05C—the question of whether Jackson suffered 'significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . before age 22.'" *Id.* The school records submitted to the Appeals Council in this case are not as informative as those in *Jackson* because they do not include IQ scores. However, they do suggest academic deficiencies, poor grades, low standardized test scores, and below-average personal and social functioning. *See* Tr. at 297–300. Because the record does not allude to any intervening incident between the developmental period and the time of the hearing that would have lowered Plaintiff's IQ and because the ALJ seemingly accepted the verbal IQ of 63 and the full-scale IQ of 66 as valid measures of Plaintiff's intellectual capacity, it follows that Plaintiff had an IQ between 60 and 70 prior to age 22. *Cf. Branham*, 775 F.2d at 1274 ("We must and do assume, therefore, that in the absence of any evidence of a change in plaintiff's intellectual functioning from the time of his back injury to the time of his IQ test, that he had the same or approximately the same IQ (63) at the time of his back injury on October 24, 1979 as he did at the time of his 1982 test.").

The addition of Plaintiff's school records also undermines the ALJ's conclusion that Plaintiff lacked deficits in adaptive functioning. The school records reflect that Plaintiff had deficiencies in self-care ("needs improvement" in personal appearance), social/interpersonal skills ("needs improvement" in cooperation, courtesy, dependability, emotional maturity, honesty, and service to school), self-direction ("needs improvement" in industriousness, initiative, leadership, self-control, perseverance). *See Jackson*, 467 F. App'x at 218. Although the ALJ cited Plaintiff's ability to obtain a driver's license and

her ability to perform PRW at the SGA level, the undersigned is unable to find that such evidence refutes the evidence of deficits in adaptive functioning in Plaintiff's school records and in the record as a whole. *See* Tr. at 59, 82, 555–57. Therefore, it is necessary for the ALJ to reassess the entirety of the evidence to determine if Plaintiff demonstrates deficits in adaptive functioning.

Furthermore, because of the evidence discussed earlier that indicated Plaintiff had additional severe impairments and limitations, the ALJ erred in indicating that Plaintiff did not meet the third prong of Listing 12.05C. *See* Tr. at 34–35 (finding Plaintiff to have an RFC for light work that required she lift or carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk for approximately six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and avoid concentrated exposure to hazardous machinery and unprotected heights).

In light of the foregoing, the undersigned recommends the court find that the new evidence submitted to the Appeals Council undermines the ALJ's determination that Plaintiff did not meet the requirements of Listing 12.05C and warrants consideration of the Listing on remand.

### 3.    Illiteracy and Grid Rule 202.09

Plaintiff argues the ALJ erred in failing to find she was disabled under Grid Rule 202.09. [ECF No. 14 at 24]. She maintains the ALJ erred in failing to address her literacy, despite evidence in the record that suggested she was illiterate. *Id.* at 24–25.

The Commissioner argues that Dr. Moody's testing revealed Plaintiff was able to "read and follow a command" and "write a sentence." [ECF No. 16 at 21]. She maintains

that Dr. Moody relied on Dr. Hammond's testing to conclude Plaintiff was illiterate, but Dr. Hammond did not find Plaintiff to be illiterate. *Id.* She contends the ALJ had access to materials Dr. Moody did not review, including an April 2011 report in which Plaintiff indicated she could read, understand, and write more than her name in English and a May 2011 work history report. *Id.* She argues the Grids only apply at step five of the sequential evaluation process and, because the ALJ found Plaintiff "not disabled" at step four based on her ability to perform her PRW as a loom cleaner, Grid Rule 202.09 would not be applied even if Plaintiff were illiterate. *Id.* at 24–26.

The introduction to Appendix 2 to Subpart P of Part 404, better known as the Medical-Vocational Guidelines or "Grid Rules," states as follows:

> The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevent the performance of his or her vocationally relevant past work.

20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).

Medical-Vocational Guideline 202.09 directs a finding that a claimant is disabled where the claimant is closely approaching advanced age, illiterate or unable to communicate in English, and has a history of unskilled or no work. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.09.

"Illiteracy means the inability to read or write." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). An individual is considered to be illiterate if she "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his

or her name." *Id.* The regulation further states "[g]enerally, an illiterate person has had little or no formal schooling." *Id.* In *Dozier v. Commissioner of Social Sec.*, C/A No. 1:09-1605-DCN, 736 F. Supp. 2d 1024, (D.S.C. 2010), this court found the ALJ did not err in finding the plaintiff had a limited education, but failed to meet the Social Security Administration's ("SSA's") definition of illiteracy despite an evaluation in the record that showed the plaintiff to read at less than a second grade level and to be functionally illiterate. In *Boyce v. Chater*, 114 F.3d 1175 (Table), 1997 WL 314723, at *1 (4th Cir. 1997), the Fourth Circuit rejected the plaintiff's argument that the ALJ should have classified him as "illiterate" in applying the Medical-Vocational Guidelines because "the ALJ gave specific reasons for his determination." However, this court recently held that an ALJ did not properly consider evidence of possible illiteracy where the ALJ did not explain the weight given to a medical opinion that the plaintiff was illiterate or provide specific and legitimate reasons for rejecting it. *Glenn v. Colvin*, C/A No. 2:14-1116-RBH, 2015 WL 4878792, at *5 (D.S.C. Aug. 14, 2015).

The ALJ found the claimant had a limited education and was able to perform her PRW. Tr. at 41. However, in the alternative, he found the Medical-Vocational Guidelines directed a finding that Plaintiff was "not disabled" and that Plaintiff could perform the specific jobs of handler, document preparer, and marker stamper. Tr. at 42.

The undersigned agrees with the Commissioner's argument that Grid Rule 202.09 was inapplicable to the extent that the ALJ determined Plaintiff was able to perform her PRW. The introduction to the Medical-Vocational Guidelines indicates they may only be applied where a claimant is unable to perform PRW. 20 C.F.R. Part 404, Subpart P,

Appendix 2, § 200.00(a). However, because the undersigned recommends a finding that the ALJ did not adequately consider the severity of all of Plaintiff's impairments, a reexamination of those impairments may yield additional functional limitations that preclude the performance of Plaintiff's PRW.

The record contains some indications that Plaintiff may be illiterate, but the evidence does not overwhelmingly show that Plaintiff is illiterate or that her condition meets the SSA's definition of illiteracy. Although Dr. Moody indicated Dr. Hammond's testing revealed Plaintiff to be illiterate, Dr. Hammond did not assess illiteracy. *Compare* Tr. at 551, *with* Tr. at 559. Furthermore, Plaintiff demonstrated variable abilities to read and write between examinations. *Compare* Tr. at 550 ("She was unable to write a sentence describing the weather and wrote, "thet is sum."), *with* Tr. at 558 (able to write the sentence "I am good"). Upon remand, if the ALJ proceeds to step four and determines Plaintiff is unable to perform PRW, he must consider the evidence that suggests Plaintiff may be illiterate and weigh that evidence to determine if she meets the regulatory definition for a finding of illiteracy. *See Glenn*, 2015 WL 4878792, at *5.

4.      Treating Physician's Opinion

Plaintiff argues the ALJ erred in giving little weight to the results of the functional capacity evaluation, despite the fact that her treating physician adopted its findings. [ECF No. 14 at 25–27].

The Commissioner argues the ALJ relied upon substantial evidence to support his decision to give limited weight to Mr. Couture's report. [ECF No. 16 at 23]. She maintains the restrictions Mr. Couture indicated were based upon a one-time assessment;

were inconsistent with the medical evidence of record, Plaintiff's history of conservative treatment, and her daily activities; and were not supported by Mr. Couture's examination findings. *Id.* at 23–24.

In her reply, Plaintiff argues that the ALJ did not consider that Mr. Couture's findings were adopted by her treating physician and did not evaluate the opinion based upon the stricter requirements that apply to treating physicians' opinions. [ECF No. 17 at 7]. She maintains the ALJ's conclusion that the opinion was entitled to little weight because it was not the opinion of an approved medical professional was not supported by substantial evidence. *Id.*

The opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, if a treating physician's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, all of the medical opinions of record should be weighed based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the

medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c). In weighing these factors, ALJs must be mindful that even if a treating physician's opinion is not accorded controlling weight, it should generally carry more weight than any other opinion evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

The ALJ gave little weight to the opinion at issue because he found that "MSPT Couture is not an acceptable medical source pursuant to the requirements of 20 CFR §404.1513(a) and §416.913(a)" and "cannot provide a legally acceptable medical opinion concerning disability." Tr. at 37. The ALJ acknowledged that the opinion "was a joint opinion with a physician whose name is illegible but who signed off on the conclusions," but he determined there was "no indication that the signing physician examined or observed the claimant." *Id.* The ALJ pointed out that Mr. Couture conducted a one-time assessment and had no ongoing treatment relationship with Plaintiff. *Id.* He stated the "opinion cannot be considered impartial due to the financial relationship between the claimant and MSPT Couture." Tr. at 38. He concluded it was "most noteworthy" that there were no medical findings to support the functional limitations set forth in the opinion in either Mr. Couture's examination findings or the record as a whole. *Id.* The ALJ also noted "[s]ignificantly, the record does not contain any evidence from a treating

or examining physician, that the claimant is disabled or has limitations greater than those determined by this decision and the residual functional capacity herein." Tr. at 39.

The undersigned recommends the court find the ALJ did not adequately consider and weigh the opinion at issue based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ erroneously stated that Dr. Wiggins, "the physician whose name is illegible but who signed off on the conclusions," had not examined or observed the claimant. Tr. at 37. In fact, Dr. Wiggins treated Plaintiff on at least four occasions between December 2011 and January 2013. Tr. at 435–39, 531–33, 536–38. In erroneously concluding that Dr. Wiggins had not examined Plaintiff, the ALJ erred in assessing three factors under 20 C.F.R. § 404.1527(c) and 416.927(c)—the examining factor, the treatment factor, and the supportability factor. The ALJ failed to consider the opinion as that of a treating physician, which inherently carries more weight than any other opinion evidence. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In fact, the ALJ specifically recognized and presumably penalized Plaintiff for the fact that no treating physician had assessed any limitations when her treating physician had assessed specific limitations. *See* Tr. at 39. Although the ALJ did consider whether the opinion was supported by Mr. Couture's examination findings, he did not assess whether it was supported by Dr. Wiggins' examination findings. Because the ALJ erred in weighing three of the five required factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c) and because he did not give Dr. Wiggins' opinion appropriate deference as the opinion of a treating physician, the undersigned recommends the court find substantial evidence fails to support his decision to give the opinion little weight.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 25, 2015                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).